We'll hear argument this morning in Case 14-181, Gobeille v. Liberty Mut. Ins. Co. Ms. Acey? Mr. Chief Justice, and may it please the Court, under the principles this Court adopted in Travelers, Vermont's collection of health care data is not preempted. The database statute does not affect ERISA plans in any way that undermines ERISA's core objectives, does not require plans to offer benefits, affect the financing or fiduciary standards for plans, or change the way that plans administer benefits to their members. Vermont is merely collecting standardized data that Blue Cross necessarily generates and already provides to the state for itself and other entities. It hasn't been argued by Liberty, and we can ask them about that, that this is burdensome, that it might be different from state to state and so forth. And it may be that this sounds more in conflict preemption than statutory preemption, but can you just answer a few questions? Does this apply to people that are not residents in Vermont but have been treated in Vermont? And does it also apply to people that are outside of, that are Vermonters but are treated outside of Vermont? I mean, who's the universe to whom this applies? And it seems to me that that would be difficult for plans to figure out. As implemented by the Board, Your Honor, the database requirements apply to Vermonters receiving health care services from a covered insurer regardless of their location, so both inside Vermont and outside Vermont, if it's paid for by a covered insurer. It does not, the Board has chosen not to require data from non-Vermont residents receiving care in Vermont. With respect to the, to the burden, and with respect to the burden issue, Your Honor, there is I would say it's chosen to. Does the statute authorize it to? The statute authorizes it to do either, Your Honor. We ought to consider that, don't you think? I don't believe so, Your Honor, because the program that has been challenged here by Liberty Mutual is the program as it has been implemented by the Board, and that is how it has been implemented. And this kind of generally applicable health care regulation is not preempted for the reasons that this Court has expressed in a series of decisions, including Travelers, De Bono, Mackey, and Dillingham. One of the points that Justice Kennedy suggested that the States can have different reporting requirements, so it's a little bit like Egglehoff in that respect, that if there were uniform requirements, that would be less burdensome. But if each State has its own specifications, then that becomes burdensome and costly. Your Honor, two responses to that. The first is that there is simply no evidence in this record that there's any cognizable burden on the third-party administrators who are health care insurers who generate this data and are providing it already in their capacity as insurers. Second, certainly some States may choose to do these programs differently, but as some of the amicus briefs explain, including the brief from the National Association of Health Data Organizations, these are carefully designed programs that track the electronic transaction rule under HIPAA that provides national standards for electronic claims transactions. Kennedy. Suppose States had different reporting requirements and the plan showed, which they haven't, I don't think, showed, but suppose they showed that this was burdensome. Does that affect the analysis of the preemption question? Only in this way, Your Honor. I think the Court's holding in Travelers can be distilled to basically three questions. The first question is, does the plan — does the State law specifically and directly regulate ERISA plans only? That's not at issue in this case. It does not. The second question is whether the State is regulating in an area that Congress reserved to the States or is regulating in an area with which ERISA is principally concerned. And here the State is engaging in classic health care regulation. So on that question, the answer is no. And then Travelers leaves it open. Scalia, you could say that it's engaged in health care regulation. You could also say it is engaged in data collection. And if you say the latter, that is something that ERISA covers. Your Honor, ERISA governs plan financial reporting and plan disclosures to the members. Primarily, the reporting requirements that ERISA sets out are about the plan finances, actuarial statements, statements of audited financial statements, information about how the plan is — about the degree of the plan's financial soundness. And nothing that Vermont is doing has anything to do with any of that. Is that still true after the Affordable Care Act? Doesn't the Affordable Care Act include in ERISA a section authorizing the Secretary to gather information from plans for the purpose of improving health outcomes? Yes. The Affordable Care Act made a technical amendment to ERISA, which in turn incorporated the Act's amendments to the Public Health Services Act. Those do not change the test for ERISA preemption. They're not part of the plan's annual reporting to the Department of Labor. There's a couple of reasons for that. One is that the Affordable Care Act itself has an almost anti-preemption provision, a provision that says that the Affordable Care Act only prevents those State laws that prevent the application of the Act. Part 7 of ERISA also, which has those amendments in it, is not part of ERISA as it was originally passed. That was added by HIPAA. And Part 7 itself has a provision that says it does not affect preemption. Why does it matter whether it was in ERISA as originally passed? It's in ERISA now. And it is true that there is a sort of an anti-preemption provision, but there is also a provision in the Affordable Care Act that says that the provisions that are added have no effect on the ERISA preemption provision. That's right, Your Honor. So what do you make of that? What I make of that is that it does not change the test for preemption either way. And when Congress passed the Affordable Care Act, travelers had been on the books for years. The standard set forth in Travelers, which reserved to the State's health care regulation, was understood by Congress, and it was not changed. And this program that Vermont has adopted is classic health care regulation. The data is collected. It is health care regulation. Vermont also has laws that govern fiduciaries. So could they have a statute which says all fiduciaries, including fiduciaries ERISA fiduciaries, must report, fill out the following forms about how they invest their money? Can they do that? They could have a standard for fiduciaries. No, no, no. Can they do just what I said? Or is that preempted? It would be preempted and applied to ERISA plans. Correct. Now, suppose instead of that what they say is what we would like is that all fiduciaries of ERISA plans send us each month a report of all of the benefits under the retirement plan that they have paid to any member. Can they do that? Your Honor, I think the answer to that probably depends on the area in which the State is regulating. I said what they are doing is they have their secretary of health and human services that would like to know how wealthy or poor the workers are. So that's what they do. I think that would present a very close question. Do you think that's a close question? That is a close question. In other words, they can gee, I see case after case here that says that reporting requirements are a central function. You know, you've read them just as well as I. And it seems to me surprising that they can do that. Isn't that the job of the Labor Department? I think that is primarily the job of the Labor Department. And I say that it matters what the others are doing. Breyer, because obviously my question is a good answer, because you are saying I'm not getting anywhere with this line, because I'm going to say what about health care? That's the next question. My actual question I'm driving at is this. You should have the information. I have no doubt about that. But the question is whether you have to go to the Labor Department first or HHS and say we want uniform rules here, or whether they have to come to you when the rules of 50 States turn out to be a mess. And you say you want to go first and let them come after me. And I think the other side says, no, if you want to do what you want to do, go to the Labor Department, get a national rule that gives you a large range to get what you want. And I don't know the answer to that question. That's why I ask it. And, Your Honor, the answer to that question is that because this is classic health care regulation for which States are responsible, insurance rate review, budget review, health care research, it is an area in which States are permitted to regulate. And they're permitted to regulate even slightly differently from State to State. And as a Department of Labor, the Federal Government agrees with us that this is an area that ERISA leaves to the States, even though it involves data collection. Because ERISA cannot possibly have been intended to sweep away all collection of information from plans by States. Congress adopted a deliberately expansive definition of a welfare benefit plan in ERISA that includes not just the direct provision of medical care, but also daycare centers, apprenticeship programs, prepaid legal services. These are all areas in which when plans would act, they would necessarily be providing information to States. I see that. I see that argument as to ERISA as originally enacted. But I am very troubled by the fact that it now authorizes the collection of data for the purpose of improving health outcomes, health care outcomes. I don't see how that, unless the anti-preemption provision saves the day, I don't see how that does not undermine your principal argument, which is that ERISA may preempt reporting of financial data and that sort of thing, but it doesn't preempt the collection of data regarding health care. Your Honor, the scope of ERISA's preemption provision in 1144 is governed by what Congress intended when it passed ERISA in 1974. And the later amendments to ERISA regarding group health plans include the language that says, does not affect or modify that standard. So this Court, when it is considering the scope of the areas that Congress left to the Court. Alito, I don't see how that can possibly be. If Congress enacted an amendment tomorrow that says one of the core purposes of ERISA is to collect health care information, and here is a here is the health care collecting requirement, you would say, well, that's not preempted because that wasn't the purpose when they enacted the preemption provision originally. I would certainly say that was not preempted if it was added to Part 7, which says that Part 7 does not affect the test for ERISA preemption in 1144. Scalia Well, saying it doesn't affect the test is quite different from saying that nothing changes. The test remains the same, but now that test is applied to collection which the Labor Department is itself conducting, or is itself authorized to conduct. That's not changing the test. It's simply changing the facts to which the test has been applied, or the law to which the test has been applied. It would change the test, Your Honor, because if ERISA was now considered to have a broader, expansive scope that intruded into health care, that would change this Court's settled precedent in Travelers and De Bono. And again, Congress would say that's not the case. Scalia No, that doesn't change the test. Our test would still be the same, whether it's a core function of ERISA or not. And it has made it a core function of ERISA. It has not made it a core function of ERISA. It has the Affordable Care Act's amendment to ERISA. And again, there's also, in addition to Part 7's preemption language, there is the Affordable Care Act's anti-preemption language. And to think that when Congress passed the Affordable Care Act, which contemplated a robust Federal-State partnership in health experimentation, which included language that authorized the Department of Health and Human Services to provide Medicare Medicaid at the same time. The State representative says this is what we want to do. Will you please promulgate a regulation, you can do it maybe in 90 days or 120 days, which says that this and similar things are fine. And in our opinion, it's not preempted. I think you could do that. That's my opinion. I may be only one who thinks that. So I think it's just a question of which forms you have to go through. But if we take you and say, and I'm going to ask this, I'm really asking the government this question, because I don't see why they are on your side, and they'll have an answer to that. You say, I want to find out. But what I want to find out is this, the factor I saw was 93 million people have these plans. And if 93 million people have these plans, there can be 50 states with 50 different sets of regulations imposing a huge financial burden upon health care. And were that to happen, suddenly all the people we're trying to help under this plan will find themselves much worse off and purely for bureaucratic reasons. If I take their side of it, I can have some assurance that the purpose of Congress in these statutes will be fulfilled, because there will not be unnecessary, conflicting reporting requirements, which sound like nothing, but they're very expensive to actually implement. Now, that's my basic problem. It's the same question for you, for the government, and for the other side. But the other side will agree with the way I put the question. And if I may try responding this way, Your Honor, the notion that it's more efficient for the Department of Labor to collect a subset of standardized requirements is not true. Breyer. They're not going to collect anything. All they're going to say is, in our reg, you have permission to go and impose these requirements. But by having to go to them first, we prevent the conflicting requirements of 50 different systems. And it's possible that they may be able to do that. I'm not sure where that authority would come from. It isn't clear. It isn't clear that they're able to do that, is it? I mean, it isn't clear that a Federal agency can eliminate preemption by simply saying, okay, you can go ahead and do it. Even though it's otherwise preempted under the statute, we say it's okay. I think that's not a clear question. I think it's not clear that they can do that. And again, I think the question for the Court is not what the Department of Labor can do, but what Congress reserved to the State. I know your time is running out, but consider two cases. Case one, Vermont is the only state that requires this. Case two, 50 states require this, and it's all different, and it's burdensome. Same preemption analysis? Yes, Your Honor, same preemption analysis, as in Travelers and De Bono and Mackey. And same result? Yes, Your Honor, same result. As in Mackey, where this Court held that State garnishment litigation procedures as applied to the very benefits that the plan was paying out were permissible. Clearly, those were going to vary State by State and involve the plans in State by State regulation. On rebuttal, because I don't want to eat up more of your time, would you go through the — through more carefully, more slowly, the fact that this information is all electronic, all of it already set out in the HIPAA regulations, and so it's just a question of — and now all reporting is being done in one system, ICD-10, right? Everybody has to use the one computer system. I am not actually familiar with that, but I will say that, if I may reserve my remaining time. Thank you, Counsel. Thank you. Mr. Bash. Mr. Chief Justice, and may it please the Court, I would like to start, if I could, with Justice Breyer's questions, and then hopefully I can move on to Justice Alito's questions about the ACA and Justice Kennedy's questions about the burden here. Let me set out how we see the interaction of the preemption framework and record keeping requirements, and then turn to what I think DOL's role is here. Both sides agree, essentially, that ERISA plans can be subject to some reporting requirements, probably many reporting requirements, incident to State laws in other substantive fields. So, for example, the Solicitor General gave the example of daycare centers. ERISA plans can run daycare centers. I don't think anyone doubts that you can have all sorts of reporting requirements to make sure the staff is trained, the facilities are safe, and so forth. This Court's case in De Buono upheld a tax imposed on employer contributions to an ERISA medical benefit plan that provided the medical benefits directly. And we told the Court at the time that that tax had all sorts of reporting requirements. So, essentially, the question is here, where to draw the line between the reporting requirements that are permissible and those that are nonpermissible. As I take Respondent's view, it's that there is certain information that is so core to the plan that you simply can't have State law reporting requirements about that information. I don't think that can be right. Take, for example, real property held in trust by a pension plan. DOL requires reporting on that. Obviously, you need to know the assets the pension plan has. But certainly a State taxing authority can require reporting about that same information to assess a property tax. The same was true with a tax in De Buono. The same is true, by the way, in Dillingham. That was a case about an ERISA-run apprenticeship program. And California law said you either follow our standards for apprenticeship or you have to pay a higher wage. I mean, that was as core as you get. It was literally the way the apprenticeship program was set up. So I don't think the test can be whether the information is in some sense core to ERISA. I think the test has to be, is this reporting requirement incident to a law in the field governed by ERISA, vesting, funding, fiduciary duties, and so forth, or is it incident to a law in health care or in daycare center regulation? Here, I don't think anyone disputes. This information is used for hospital budget review, for health insurance rate review, for medical research. There's no question that it's incident to classic State health care regulation. But why isn't there also a requirement that the law just not be burdensome over a certain level? It is, Justice Kagan. I think I cut short my test. The first inquiry is, is this incident to a field that ERISA doesn't govern? I think that's satisfied here. But then there's still another question under Travelers, which looked to both purpose and effects, of whether the effect of the law is so burdensome that effectively frustrates or impedes the design of ERISA plans or the administration of ERISA plans. And I think a law like this that imposes reporting requirements on claim could theoretically be that burdensome. And someone in response to that would say, well, I don't think it's that burdensome. Kennedy. How is that any different than conflict preemption? How does that give any special effect to the statute here? I mean, you could make that argument if there was no preemption provision. Well, I think the way it's different than conflict preemption, or at least one way, is that if it actually is in the core field governed by ERISA, I mean, if the State said, we just want to make sure these pension plans are well funded, so we're going to ask for reports incident to that rule, it would be preempted, even if the requirements weren't particularly burdensome. I mean, the Court has never held that in a specific case, but I think the Court's analysis leans towards that direction. So it could either be within the preempted field, in which case it relates to ERISA plans and it's out, or it could be so burdensome that it effectively frustrates the purpose of a uniform ERISA fee. Scalia. The former sounds to me like standard field preemption, and the latter like standard conflict preemption. Is that what you're saying? There have been some well-written separate opinions in this area that have suggested that. I don't think — I don't think — I mean, here's what I would say about that. I mean, I know your opinion and the opinion of a few other Justices have suggested we should shift to field preemption. I think if the Court were to say what we've been doing all along is field preemption and it makes more sense doctrinally to classify it that way from the Department of Labor's perspective, that would be fine. I mean, I think we would be a little bit concerned if the Court signaled to lower courts in its opinion that it was marking a big shift in its jurisprudence that could destabilize the law. We think— Breyer. Why aren't you on the other side of the case? That is, I was fine with you until I read a few of these amicus briefs. And then suddenly I saw 93 million people, and there are associations all over the place that are worried about this problem. And they have a big chart where they show the possibilities of conflict. You yourself are worried about conflict. Conflict among States and requirements means money, a lot of money. That's what they say, and that's plausible. So what I want to know is what do you all propose to do about that in the U.S. government? One thing to do about it, and I've looked up the regs, so maybe Justice Scalia disagrees, but I'm talking about what I think. All right. The — it seems like they would have authority to issue regs either way. Blocking or getting permission first. That's where I ended up, and that's what I wanted your view about. You see what I'm saying? I see what you're saying. There's two pieces there, whether this actually has a burden and what we could do about it if there was. I didn't mean to suggest we think it has a burden. It's the view of the Department of Justice that the significant burden has not been shown — the Department of Labor that the significant burden has not been shown here. So that's starting premise. We do not agree with that. All I'm saying is that if a party could show that burden, that would raise a substantial preemption question and would be highly relevant in a preemption analysis. Kagan. So why hasn't that burden been shown? Respondent submitted nothing below. I mean, really. They submitted an Internet fact sheet. There's something very intuitive about their argument, and it's essentially  It's — it's when 50 States devised 50 different requirements for this, different formatting, different particular information requested. That just all adds up to a lot of hassle, which all adds up to a lot of money. Two points. I mean, first, it seems far less burdensome than State laws this Court has already upheld or that State laws that I think most people would agree have to be upheld. I mean, the tax — or the surcharge in travelers, that was the case where if you bought commercial insurance, you had to pay a surcharge up to 24 percent more on medical purchases. That's unbelievably burdensome. And surely had reporting requirements associated with it. And having to pay vastly different surcharges in 50 States could be burdensome, too. What this Court's precedents have said, including travelers and Dillingham and de Buono, is that a mere burden is not enough. What has to be shown is that it interferes with the administration of benefits. So in Eaglehoff — Roberts, a consistent theme in our cases when you say a mere burden is not enough is that the government wants employers to, one, set these things up, they don't have to, and, two, they want the money to go to benefits, not to go to administrative and bureaucracy expenses. Is it your view in analyzing this question, do we look at what would happen if 50 States adopted different programs, or do we look at just Vermont, because Vermont happens to be first? The former. Our view is that you have to contemplate that 50 States would adopt different regimes. Yeah. I think that's right. So you don't think 50 different regimes of reporting is going to require a significant diversion of money away from benefits to administration? Not on this record. Mr. Chief Justice, recall— Well, what kind of a record do you need to show that? I mean, of course you can't have a record of what 50 States are doing if it's a hypothetical question. Well, I think there's a couple ways Respondent could have made the showing here. I mean, at minimum, Respondent could have had its own third-party administrator come in and say, these reporting requirements are burdensome, this is what we've had to do. We've had to change the way we process claims because they're so burdensome. I suspect they could not have made that showing. Well, but you have pages 26 and 27 of the Blue Cross Blue Shield brief. And there they have a big chart, and there are all these organizations out there that are trying, like the Uniform Law Commissioners, to create uniformity. That's why I say, that's why I'm puzzled as to what to do. Well, am I supposed to write an opinion that says, even though Blue Cross Blue Shield feels it's a big mess and trying to straighten it out, they didn't make the right record in the Vermont trial court? How do I write that opinion? Going to the chart point, I mean, the chart actually doesn't show conflicting requirements. Most of the counterpoints they have are, like, not required. I don't think they're conflicting requirements. And even if you look at the end of the Blue Cross Blue Shield brief, they never actually say this is an issue. I'm serious. How do I write the opinion? Suppose it could happen, but it hasn't happened yet. How do I write the opinion? I think the opinion is written like this. One, this is a reporting requirement incident to a field that is not governed by ERISA, health care regulation. It's presumptively valid, but we're going to look and see if Respondent has made a showing that it's so burdensome that it fundamentally changes the way plans are administered or designed. Respondent has not made that showing here. That is how the opinion is written. I mean, this Court has never actually said that a burden is so bad that it's preempted even if it operates in a field outside of ERISA. It is suggested in dicta that it's possible, but that is inherently a factual determination, and it's hard to see how the Court could reach that conclusion without some factual showing in the record of the case. Roberts. Roberts. At one point, I'll send the eleventh State that does this, and it's eleven different things, we say is that a burden? Is that a sufficient burden? Maybe we say no. But then when 30 States do it, maybe it's a different answer. It seems like a very odd preemption analysis. Well, I don't think it should turn on that, Mr. Chief Justice. I do think it's appropriate for a court to consider what if 50 different States impose different requirements like this. But just like 50 different States might have different requirements for daycare centers or for prepaid legal services, that I don't think is the sort of burden ERISA has. Roberts. Well, but this goes to basic, very comprehensive reporting of data. It's not simply, well, if you run a daycare center, you have to comply with the rules about daycare centers. Of course you do. It's quite different. One of the things ERISA plans do is report data and compile data. And it seems to me that the analysis that says, well, daycare centers you can, that seems a little bit off base. May I respond, Mr. Chief Justice? No. Of course you can. Please. I think that the — I'll try to do it in two sentences. I think that the burden here is far less substantial than the burden of complying with State apprenticeship regulations for the way you design the program in Dillingham. Here, most self-insured plans use third-party administrators, and often those third-party administrators are insurance companies that already have the infrastructure in place for reporting requirements as applied to them, which cannot be preempted under ERISA. Thank you, counsel. Mr. Waxman. Mr. Chief Justice, and may it please the Court, a signal goal of ERISA enacted in 1974 was to foster employee benefit plans that could operate nationally, under nationally uniform rules of administration, first and foremost rules about recordkeeping and reporting. Now, of course, ERISA plans, like other regular businesses, are subject to ancillary regulation, like maintaining a safe workplace, paying minimum wage and prevailing wage laws, paying their State real estate taxes on their headquarters, and if they choose to run a hospital, run a law firm for their legal services benefit program, run a child care center, they are subject to local regulation like other providers of those local services. But in every single case in this Court and every lower court decision that I have found in which courts have upheld State-by-State reporting requirements, it has always been incident to a substantive obligation that the State could impose. And no one contends that Vermont could impose substantive regulations on the claims that Liberty Mutual pays under its employment plan. Now, I want to go to the point of that. Mr. Waxman, why was it that you introduced absolutely no evidence of burden in the lower courts here? That is not true, Justice Kagan. We did not introduce any evidence about what it would cost us in dollars and cents to have Blue Cross Blue Shield comply with the Vermont request that is the subject to the subpoena. But we did introduce substantial evidence in the record below, and some of it is included in the joint appendix and all the pages that are extra long, folded in, about what it is that we have to do, both in Vermont and in the then 15 other states that imposed very, very different reporting obligations. So we didn't put a dollars and cents in, but we did make the lower court, the district court, on its request, very aware of this very substantial burden. And Congress, in determining, in deciding to, in exchange for blanket Federal regulation of these fostered national plans, to grant a very broad preemption provision that says this is going to be Federal regulation, not State regulation. Breyer. What about the converse point for you that I was making before? The number that jumped out from the page is the 93 million people this affects. Now, that's a huge number, and therefore the risk of conflicting regulations is serious. It's in raising costs. That's for you. But they say it hasn't been shown yet. So I ask you, if it does come about, if it should come about, and you lost this case, why can't your clients go right to the Department of Labor, whose regulations I've read, or possibly ACCA, and say, we want you to impose a uniform national data collection system, or the equivalent, put limits, and then preempt the conflicting State limits? Now, it may be other members of the Court do not agree with this approach, but I've written a case, Metro Media, where I think the agencies have a lot of power there. And I think they have more capacity to decide this kind of thing than a group of judges. So what about that for you? Justice Breyer, a couple of points. First, in the lower court, and in this Court, neither party on the other side has disputed what I think is the self-evident proposition that the Department of Labor, and now the Department of Labor, and the Department of Health and Human Services, absolutely have the statutory authority under ERISA to impose the kind of record-keeping and reporting requirements that Vermont and now 17 or 19 other States do. They have never disavowed that. The SG's brief at both the invitation stage and the merits stage sort of coyly suggests that that's right. Kagan. Well, that sounds like a one-size-fits-all solution, and there's some value to States being able to think about their own health care needs and to think about what things they want. So, I mean, just again, let's go back to this burden, because it is a very intuitive idea that you have on your side 50 different States. That's a lot of money, but I guess I wonder why it is a lot of money. I mean, as I understand what's going on here, that all the data that's being requested is data that Blue Cross Blue Shield generates anyway, that all the data that's being requested is data that Blue Cross Blue Shield reports for other people, that really this is a formatting question, even with respect to the wide variety of States, that the States have started getting their formatting more uniform. So, I mean, you know, it's you can say it's 93 million people, but, you know, in the end, what's the cost? Oh. And why don't you have it in the record? Okay. I, there is not a, with respect to burden, Congress in enacting the preemption provision, and there we, we've cited to the court place after place in the conference reports, the House reports, the statements of the sponsors, the recognition in over, in repealing the Disclosure Act, which set a reporting, a national reporting floor and allowed the States to add on to it and record evidence before Congress that small plans were spending up to 40% of their entire assets on State reporting. Congress made the determination that this Court has reflected in many, many of its decisions, including Egelhoff, that the very fact that there could be 50 different State regulations is the burden that the preemption provision is designed to address. And the notion that- But we know, we know, Mr. Waxman, that Blue Cross is providing this information with respect to individuals and its own plans ensure, and we're told that it is providing the information for other self-insured ERISA plans who didn't make this objection. So do we know at least what is the burden of providing that information for the other self-insured ERISA plans that Blue Cross is, is providing the information for? Justice Ginsburg, the Blue Cross Blue Shield Association has actually filed a brief in this case, and it explains in great detail, as does the brief of the multi-employer plans, which, like Liberty Mutual, operate in 50 States, about the burden, about the fact that Blue Cross Blue Shield doesn't have all this information in the normal course. The multi-employer plans don't have it. And Blue Cross Blue Shield, as a third-party administrator, has told this Court just exactly how burdensome and how expensive it is. Of course, they could do it for Liberty Mutual in Vermont. The only question is how much it's going to cost and how much they're going to charge. But look, for example, at since this, since this litigation began, the Commonwealth of Massachusetts has now told Liberty Mutual that it wants reporting under its APCD statute. And as we recount at page 36 of our brief, their regulations require, among other things, the premiums the plan charges, its actuarial assumptions, the summary of its plan designs, the plan's reserves, its surplus, its provider payments, its provider levels, and information about medical procedures whose claims are denied. And the chart that we submitted in the district court reflects the wide variation in States. The burden that Congress foresaw is coming to play before our very eyes as States, more and more States, adopt these mandatory plans. Is that information, the laundry list you went through, is that already available at Blue Cross Blue Shield and being reported somewhere else? No, it is not. Absolutely not. And the Blue Cross Blue Shield Association amicus brief reports that. The multi-employer plan brief reports that they only had, that their plans generally have about 70 to 80 percent of the information that's required by any one of these States. And to go to, I think it was Justice Breyer's hypothetical, look, the same rules that apply here are going to apply to pension plans. And the State of Vermont, like many other States now, is concerned not just about health care costs and delivering good health care outcomes, but it's concerned about the financial well-being of its senior citizens. And, in fact, they've asked the Department of Labor to permit States to operate their own ERISA pension plans for their residents. Now, they could pass a database statute that says we're really concerned about whether elderly, you know, Vermonters are going to have enough money in their elder years. And we know that 93 million people are covered by employer pension plans. And we just want you to report, you can pay whatever you want, but we want you to keep records and report to us about what your plan is and how much money people are going to have when they retire, every single dollar. Well, why can't you do this? Why can't you simply go and the statute says, 1143A1, the statute says that the Secretary of Labor and the authorities brought in these has authority to undertake surveys and collect, compile, analyze, publish data information and statistics on welfare plans. Okay? That's ERISA welfare plans. So you go to them. And you say, DOL, we want you to promulgate a reg that says you will collect some of this information, but even if you collect, don't collect it all, you let the States collect the rest. Now, they can prevent it from being burdensome. Justice Breyer, I know how exciting it is to get in the middle of a jurisprudential debate between you and Justice Scalia. I don't see it. This is not jurisprudential. My fingers are tingling at the prospect. I am not sure. I am not sure that the Department of Labor has the regulatory authority to essentially excuse the preemption provision. But, and you don't have to just go to the provision of ERISA that you quoted, in 1024A2B of ERISA, it authorizes the Secretary of Labor to require the production of, quote, any information or data from an ERISA plan where he finds that such data or information is necessary to carry out the purposes of this subchapter. And, adverting to Justice Alito's comments, in the ACCA, the Secretary has the authority to require the production from plans of, quote, any other information as determined appropriate by the Secretary. So the notion that preemption here is sort of like an, operates like an accordion. If the Department of Labor has the authority to get it, but hasn't chosen to exercise, it's not preempted, but if they did promulgate a regulation, either of your color or Justice Scalia's color, that it would be preempted is a crazy, is a crazy notion. Breyer. You might think this is not sane, but the way I'm seeing it here is there are two competing problems. One is they should be able to get information like this in the States. But, two, there is a problem of burden. And I think that there are probably 100 or 200 people in Department of Labor and HHS that could write regs that reconcile those problems and allow both. But I can't, because I'm a judge. So what I'm trying to figure out is how to interpret this statute in a way that achieves those objectives. How to interpret this statute is to say that in exchange for blanket Federal regulation of these plans, now augmented in the context of health care plans, by the Affordable Care Act, the, by the Federal Government, the States are preempted from regulating the core functions of what an ERISA plan does. And there is nothing more core than the payment of benefits. If the State is attempting to regulate, whether it's by substantively regulating or reporting obligation, about the very activity that defines it as an ERISA plan, the payment of benefits, that State law necessarily relates to because it has a connection with an ERISA plan. And, frankly, it's pretty ironic that the Petitioner and the Government claim on the one hand that it is so important to get this information from these plans because 60 percent of all citizens in the United States get their health care from these self-funded plans, and yet requiring them to keep the particular records that the State wants and to report it on a quarterly, annually, or monthly basis has no relation to or connection with a plan. I don't understand how both of those thoughts can adhere at the same time.  KAGAN. Mr. Waxman, I guess I just don't understand this argument. I mean, I understand completely that there should be some restriction on overly burdensome State regulations of whatever kind. You know, it could be taxes, it could be daycare, it could be anything, right? But why is it that this regulation falls in a different category than taxes or child care or anything else? Because the State here clearly is not attempting to and is not regulating payment of benefits. It's doing something that has an effect on your operations, no doubt. But the State is operating in a completely separate area for completely separate purposes in a way that does not trump or conflict with or anything else the choices that ERISA has made as to payment of benefits. Okay. I want to come to the end and dispute that premise, the end of your question. But if you look at this Court's cases that have set about to evaluate the burden or at least included, as in the last section of Travelers, a section that says, of course, if this were terribly burdensome, it might be another question. Those are cases, and it's Travelers, Dillingham, and Dubono, we all agree on that. Those were all cases in which there was a burden being placed on an entity that wasn't in Travelers, it was hospitals, in Dubono, it was hospitals, in Dillingham, it was apprenticeship programs, all of which affected the price that ERISA plans might have to pay to get benefits or services from those kinds of providers. And so it took several sentences in each of those, several paragraphs, in each of those opinions even to explain how putting a tax on the non-Blue Cross insurance plans in Travelers or respecting the prevailing wage rate in California actually had an effect on any ERISA plan anyway, because they weren't regulation of the plans per se. They were indirect regulations. And when the regulation is indirect, that is, it is not a regulation that is directed at the very activity that makes the plan an ERISA plan, you do look at burden. And indirect regulation obviously can occur, but if, as this Court explained in the last section of Travelers, if it's too burdensome, it might be preempted. But where the regulation is direct, where the State is requiring reporting because the self-insured, because the self-insured plan is engaged in the very activity that brings it under ERISA, that qualifies it as an ERISA plan, that obviously relates to and has a connection with the plan. And it's, yes? So you're saying that the State simply cannot have an all-payer database, that that's out because ERISA precludes it, even though it's going to leave a big hole in the information that the State has about that health care being given to its citizens? I don't think that that's at all the case, Justice Ginsburg, and I don't want to be misunderstood about this. The State of Vermont, just to take one example, the database statute authorizes the relevant secretary to obtain this information from everybody, not only who pays for health care in Vermont, but the hospitals and clinics that provide it. But the secretary, the executive official, has chosen not to require that information from hospitals and clinics and doctors in Vermont. There is also no doubt that if all-payer claims databases so badly need the information from self-funded plans, and it turns out that the self-funded plan, a significant number of self-funded plans say no, that's preempted, the federal government has all the authority it needs to get that information and require that that information be provided either to the secretary and then to the States or directly to the States. And in fact, they can do what often happens in areas of field preemption and express preemption, which is to make it worth the plan's while. You know, they can offer all sorts of benefits to self-employed plans to provide this information if it's so important. What's interesting when we're talking about what is or isn't in the record in this case is no explanation whatsoever from the State of Vermont at any stage as to why they haven't requested the actual providers of these health care services to provide the information and that it is inadequate. I mean, the only exchange I can recall is in the Second Circuit oral argument transcript, which is recorded and discussed in Judge Straub's dissenting opinion, the State was asked, you know, look, how important is it to get the district judge, I think it was the district judge. Kennedy. Well, as you're explaining this, it just seems to me it's much easier to ask the plan provider than to ask 15 doctors in one small town and 50 others and all the patients, unless I'm misunderstanding your point. I think to me it's much easier. Waxman. Perhaps it's easier, but here's the point, and this is the insight of the ERISA preemption provision. The hospitals in Vermont, the clinics in Vermont, the medical practices in Vermont are not subject to varying regulation in 50 different States. They operate locally. They're subject to State regulation. Here we're talking about plans that Congress wanted to encourage that would do something new, that would provide health care benefits and other employee benefits on a national basis, and in order to foster that, to subject them to a single set of reporting, record keeping, and regulatory obligations, and that, it seems to me, is the insight of ERISA, and it was the bargain that ERISA plainly struck. I simply noted in response to Justice Ginsburg's question that the State statute gives them the authority to do it. There aren't that many hospitals in Vermont. They already have all the information about what services are or aren't being provided. The State could have said, no, no, no, we absolutely can't get by without this. But the representation at oral argument in front of the judge, which has also been transcribed and is in the record, the State, the lawyer representing the State, the judge was sort of trying to settle this case and said, you know, how much do you really need this information? And the response was, we don't really need it. This is just a couple of employees. This is just one plan, but there's a principle here, and we agree with that, and we also agree with the representations of my friends on the other side, that the question for this Court, it has to take account of the possibility, which is the emerging reality, that all 50 States and the District of Columbia and Puerto Rico will have their own mandatory all-payer claims databases that will require different things. And if I can just anticipate Justice Sotomayor's question reserved for rebuttal to the State of Vermont, our brief explains and the Blue Cross Blue Shield brief also explains how there are, of the hundreds of data fields that Vermont alone requires, there are dozens of them as to which there is no ICD, whatever the agreed national format is. There are dozens and dozens of them as to which there is no HIPAA standard, no HIPAA guarantee of confidentiality. And this is just one State. If you look, as I said, at the Massachusetts APCD statute, which is the only other State that's actually come to Liberty Mutual so far, and look at our discussion of it on page 36, the stuff that they are asking for is so obviously critical to what the plan does. But this is, this information is provided by Blue Cross for some self-insured plans, right? I believe that, I believe that the record shows that, that Blue Cross Blue Shield provides this information to Vermont, not only on behalf of itself as an insurer, but also some other. And do we know, do we know what costs Blue Shield then passes on to those other self-insured plans? We don't know it. We were not able to get it from Blue Cross at the time the case was before the district judge. But in any event, as the Chief Justice's question suggests, this issue doesn't end at Vermont. It has to take account of a burden that Congress was very, very aware of. It was very cognizant of the regime under the Repeal Disclosure Act, and the costs of plans that are trying to be national plans, complying with 50 different state regulations. And I really commend to the Court the amicus brief filed by the multi-employer plans in this case. These are plans that are essentially union-sponsored plans. They are not fancy plans. Every dollar that they have to spend gathering the data that different states say they have to have comes directly out of the benefits that they can pay. Just as if Vermont decides next week, if it wins this case, that it wants to get information about pension plans and how they're being administered and what benefits are being provided and not provided, those are all 100% self-funded plans. If my employer has to provide all that information, that is coming out of my 401k benefits. Mr. Waxman, could a state pass a tax law that requires information about pension disbursements, about claim payments, about assets held in trust? Could a state do that? I don't think that a state, when you say requested information or imposing a tax. A tax law that requires information of various kinds. I don't think a state can impose a tax on benefits that are paid. Not impose a tax, that requires information in order to ensure that the state is taxing the right things. In other words, we want to tax the benefits that you're getting. Do you think that a state tax law can't require any information about any of the things that ERISA does, that the plans do? Pension disbursements, assets, claim payments, nothing? I think not. I think that the state, I mean, I don't think this case turns on it. But thinking about it, if the state could say, look, we just want to know all the benefits that you pay to every one of our residents, I think that would be preempted. As I say, that's not what's going on here. And even if I'm wrong about it, it seems to me that this is quite different. There's a lot of discussion on the other side of, this just requires the press of a button and all the information goes, and our brief goes on for pages and pages. And the other amicus briefs show how that is so far from true. In order to comply with these, it's not just a question of saying, yes, we paid Seth Waxman $300 in benefits last year. This requires that we keep records that we don't keep and that we display them and provide information in ways that we don't and that differ from one state to another. And for those reasons, unless the court has questions, I will submit that the judgment should be affirmed. Thank you, counsel. Ms. Icy, you have three minutes remaining. Thank you. I'd like to begin with Justice Sotomayor's question about the standardized data, because I think that ties in nicely with many questions from the court about the question of burden. So, the way that electronic claims transactions work is not something that the state of Vermont invented. It's part of HIPAA. It's a federal regulation called the Electronic Transaction Rule. And it sets standardized coding and formatting requirements for the transaction between the payer and the provider. And we don't even have to look to the regulation for that, although that's in 45 CFR Part 160. But it's actually in the record at Joint Appendix 66. This is the agreement between Blue Cross and Liberty Mutual, which says that Blue Cross shall be capable of transmitting electronic data for which transaction standards have been promulgated in compliance with HIPAA Electronic Transactions Rule, and shall, to the extent possible, transmit electronic data in accordance with that rule. That is how third party administrators work, and that is why self-insured plans nearly always have a third party administrator, which is typically a health insurer, to process claims, because although it may look on the surface as though these reporting requirements and the data collection seems very complicated, it's complicated not because of anything Vermont has done. It's because there is a standardized national standard for how this data is collected, which is fairly specific, fairly detailed, and they're already doing it. And it is generating a pool of tremendously helpful data that has incredible potential to help states and the federal government figure out ways to bend the cost curve and improve the provision of health care delivery to everyone in the country. The Affordable Care Act expressly contemplated that states would do this kind of experimentation. It authorized the federal government to provide Medicare claims data to the states. It created the Center for Medicare and Medicaid Innovation, which then authorized states to experiment, to develop new models for delivery, which then need to be tested and evaluated, and the United States has explained in its brief that those programs depend upon the collection of all payer data, which is something only the states are doing. The promise here is enormous, and the fact and the loss of this data to the plans would be tremendous. I would like to address briefly one issue that my friend raised, which is the question of provider data. Vermont does, in fact, collect provider data, and we've collected it for a very long time. It's called hospital discharge data, and it was one of the first data sets that researchers looked to. But it's not as helpful as all payer data, and here's why. Hospitals don't have information that tracks care across an episode of care. If someone has their knee replaced, it starts with a doctor's visit, their surgery, there's an anesthesiologist, there's a state of rehab facility, there's follow-up physical therapy. And if you're trying to compare outcomes and cost for a procedure like that, it's the payer. The centralized payer, as Justice Kennedy said, who has all that information, there's only a few of them. That is the real power of the data, and it's not in the hospital data. Thank you. Thank you, counsel. The case is submitted.